## State of Vermont v. Robert Charles Murphy

[353 A.2d 346]

No. 233-74

Present: Barney, C.J., Smith, Daley, Larrow and Billings, JJ.

Opinion Filed February 3, 1976

*M. Jerome Diamond,* Attorney General, Montpelier, *Phoebe Morse,* Assistant Attorney General, Montpelier, *Dale O. Gray,* Caledonia County State's Attorney, St. Johnsbury, *P. Scott McGee,* Deputy State's Attorney, St. Johnsbury, for State.

*Robert Edward West,* Defender General, Montpelier, *Robert M. Paolini,* Deputy Defender General, Montpelier, for Defendant.

**Larrow, J.** Respondent was convicted below, after jury trial, of statutory rape, allegedly committed upon an 11 year old female in the Town of Wheelock in Caledonia County. The information was originally brought in the District Court of Vermont, Unit No. 4, Caledonia Circuit, but was transferred for trial, because of a conflict in courtroom use, to Guildhall in Essex County. Guildhall is the seat of the Essex Circuit in Unit No. 4. At his trial, the jury was drawn, over his protest, from a jury list comprised of residents of Essex County, chosen as prescribed by 4 V.S.A. § 952 and administrative orders issued thereunder.

Respondent briefs two claims of error. The first relates to the jury selection, as to which his claim below was that the list of prospective jurors should have included residents of both Caledonia and Orleans counties, included with Essex in Unit No. 4. The second relates to the exclusion of proffered

evidence relating to the source of an injury to the prosecuting witness, claimed by the State to have been inflicted in the course of the claimed rape. We consider these claims in this order.

Although respondent's brief reflects some confusion of the terms "county" and "country", essentially his claim is that the manner of jury selection violated his right under the Vermont Constitution (chapter I, art. 10) to "trial by an impartial jury of the country", and his rights under the Sixth Amendment to the U.S. Constitution to trial "by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law," binding on the several states under the Fourteenth Amendment. These claims he raised by appropriate motions challenging the array.

■■ The history of the Vermont provision cited by the respondent has many unique aspects. The use of the term "country" as opposed to the more common state provisions for juries of the "county" or of the "vicinage" is extensively reviewed in *State* v. *Brown*, 103 Vt. 312, 154 A. 579 (1931). Dealing there with a specific statute authorizing trial of an offense in a county other than the one of commission, the court considered the historical background of the provision and its derivation, and concluded that the language in question was used "for the purpose of enlarging the scope of legislative authority over the place of trials in criminal actions." *Id.* at 321. V.R.Cr.P. 21(b) permits transfer of a case to another county or territorial unit for the convenience of parties and witnesses and in the interest of justice. Respondent does not argue that this rule was not complied with, and we feel that its constitutionality is confirmed by the learned opinion in *Brown, supra*. Whatever the conclusion with respect to other state constitutions using a different term, we are satisfied that the Vermont Constitution leaves broad discretion to the Legislature respecting the place of trial, and does not, as *Brown* indicates, require jurors to be drawn from all counties in the unit. We can judicially notice that the inclusion of several counties in one jury list can well lead to delays and inconveniences. And, where there is no systematic exclusion of classes of jurors, the restriction of the panel to areas of

geographic convenience does not, standing alone, violate constitutional rights or demonstrate prejudice. *State* v. *Mercier*, 98 Vt. 368, 127 A. 715 (1925); *State* v. *Pilver*, 91 Vt. 310, 100 A. 674 (1917). In any aspect here material, we are not aware and respondent does not attempt to prove that people's attitudes differ along county lines. Cf. *United States* v. *Butera*, 420 F.2d 564 (1st Cir. 1970). No violation of the Vermont Constitution appears.

 His Sixth Amendment claim fares no better, and in many respects worse. That guarantee requires only an impartial jury of the State and district where the crime is committed, with the district having been previously ascertained. The geographic provisions of this clause have been literally complied with. A jury of the "vicinage" is not required under the Sixth Amendment, that requirement of the common law not having been carried forward into the Constitution. *Williams* v. *Florida*, 399 U.S. 78, 96 (1970). The fundamental test which must be met under the Sixth Amendment is whether the right claimed is a "fundamental right, essential to a fair trial." *Gideon* v. *Wainwright*, 372 U.S. 335, 343–44 (1963). The selection of a petit jury from a representative cross-section of the community is really the right which respondent relies on, and the essence of his claim is that the residents of Caledonia and Orleans counties are, as a matter of law, an identifiable group entitled to group-based protection, so that their exclusion from his jury panel is discriminatory. *Hamling* v. *United States*, 418 U.S. 87, 157 (1974). We cannot agree.

 This fair cross-section requirement of the Sixth Amendment is interpreted to insure that distinctive groups are not excluded from the jury pool. *Taylor* v. *Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 43 U.S.L.W. 4167 (1975). To date, at least, the U.S. Supreme Court has found such "distinctive groups" only where race or sex formed the basis for exclusion. *Carter* v. *Jury Commission*, 396 U.S. 320 (1970); *Glasser* v. *United States*, 315 U.S. 60 (1942); *Hernandez* v. *Texas*, 347 U.S. 475 (1954); *Taylor* v. *Louisiana, supra*. The claim here advanced is essentially geographical and nothing more. No exclusion of any distinctive group appears. Indeed, the counties involved, sharing as they do the proud sobriquet

of "Northeast Kingdom," are claimed by many to have common characteristics more pronounced than those of any other areas of the state.

Further, although not determinative, we note that the U.S. Supreme Court has treated criminal venue as a matter of procedure, appropriate for delineation by rule, that federal criminal prosecutions may be tried in any division of a district, and that in Vermont, a single district without divisions, jurors are customarily drawn from specific geographic areas of convenience. This often results in exclusion of jurors from the county of the offense, without violation of the Sixth Amendment. Cf. *United States* v. *Partin*, 320 F.Supp. 275 (E.D.La. 1970). The procedure authorized by our rules, and followed here, is substantially identical. No violation of respondent's Sixth Amendment rights appears.

For adequate consideration of respondent's second claim of error, a short review of the facts involved is required. The 11 year old girl involved in the alleged statutory rape had been living for several months with her mother and the respondent, who were cohabiting in the same house. She and the mother were the principal witnesses against respondent. The alleged victim described the claimed sexual act with clarity and precision, and the mother testified to her injuries after the event. The mother denied any personal difficulties with the respondent, but he claimed they had come to a breaking point in their relationship, denied the act in question, claimed alibi, and also that he was "framed" in an effort at revenge. The mother did not report the event to local authorities, but took her daughter to Massachusetts, to her former husband, a policeman, father of the girl. The husband caused her to be medically examined and later filed complaint. The examining doctor, from Massachusetts, was a trial witness, and described various contusions and cuts on the girl's body, including a contusion on her hymenal ring. His opinion was that the injuries were consistent with the girl's story of the occurrence, although some of them could have been caused other than by intercourse.

The complainant first denied she had been restricted, prior to the offense, from visiting her girl friend, then later admitted she had been but couldn't remember why.

■ The defense offered to prove, through cross-examination of the complainant, cross-examination of the complainant's mother, and direct examination of a friend of the mother, a Frances Derusha, that about a week before the alleged rape the complainant had been caught by her mother in a barn, with a girl friend and two boys, engaging in masturbation. Derusha's evidence was to be that the mother had told her of this incident. The complainant and her mother, of course, would have been eye witnesses. The offer, as twice made, was to test credibility and to show that some of the described injuries, particularly the contused hymenal ring, could have been caused by activity other than the complained of rape. To this proffered evidence the State objected vigorously, and the court ruled that testimony of prior sexual activity of the complainant was inadmissible, in clear reliance upon *State* v. *Stimpson,* 78 Vt. 124, 62 A. 14 (1905), holding such testimony generally inadmissible in a statutory rape prosecution because its bearing on the likelihood of consent is immaterial when consent is no defense to the act. It now cites numerous supporting cases for the general rule, which respondent does not question.

But the ruling mistakes the purpose of the offer. Respondent does not claim that chastity or its lack has any direct correlation to veracity. He does not dispute the holding of some cases that unchaste acts with a female under the age of consent are crimes against her, which cannot affect her credibility. What he claims here, and clearly claimed below on two distinct offers of proof, is that he was entitled to show that some, at least, of the injuries described to the jury could have been caused by another person, consistent with his denial of guilt, claim of alibi, and claim of prosecution for revenge. This he was entitled to do, by evidence otherwise admissible. The proffered testimony of Mrs. Derusha might well have been inadmissible as hearsay, but the eye-witness testimony of the complainant and her mother was not open to that objection. Coupled with the admission of the doctor that other causes were possible, the incident could well have had great significance to a jury. Indeed the State argued at length to the jury the improbability that a mother would injure her daughter's sexual organs merely to avenge herself on the respondent, and the respondent was forced to confine his argument to

the only related fact which got into evidence, that the complainant had been restricted to the house for an unexplained reason. The admissibility of unchaste character is not the issue here raised, but the cause of complainant's injuries. The injuries were put in evidence against the respondent, and he was entitled to explain them, if he could. The policy of excluding evidence of unchaste character because it lacks relevance has no application where such relevance exists. Clearly, had the complainant been attacked by another person an hour or so before the alleged attack here, with resulting injuries, evidence of the first attack as causative of her injuries would be admissible. The longer intervening time interval here does not alter the principle involved.

Accord, *State* v. *Nab*, 421 P.2d 388 (Ore. 1966).

We are fully cognizant of the gravity of the offense of which respondent stands accused. We are equally mindful of his criminal record, operating both to impeach his credibility and, conversely, to make him more vulnerable to vengeful fabrication. Where, as here, it was admitted that some of the portrayed bruises did not result from attack, he was entitled to show that this could well be true of those most inculpatory in nature. The heinous character of his act, if proven, and the lawlessness of his past, cannot operate to deprive him of his right to a fair trial. We note the cogent words of Mr. Justice Douglas in one of his last pronouncements before retirement:

> It was suggested at oral argument that applicants' lawless actions can be curbed only by denying them legal refuge. Yet all constitutional guarantees extend both to rich and poor alike, to those with notorious reputations as well as to those who are models of upright citizenship. No regime under the Rule of Law could comport with constitutional standards that drew such distinctions.

*Smith* v. *United States*, 423 U.S. 1303, 96 S.Ct. 2, 5 (1975).

*Judgment reversed and cause remanded.*